## HARRY HERMANN, Respondent, v. ST. JOSEPH RAILWAY, LIGHT, HEAT & POWER COMPANY, Appellant.

**Kansas City Court of Appeals, May 9, 1910.**

1. **COMMON CARRIERS: Street Railways: Right to Refuse to Carry Passengers.** A street car company has the right to move its cars from one place to another on its lines, without putting such cars in passenger-carrying service, and a person who is' advised of the fact that a car is not carrying passengers and who thereafter insists on taking passage on such car is a trespasser.

2. ———: ———: ———. While a carrier has the right to eject a trespasser from one of its cars, it must use no more force in his expulsion than is reasonably necessary to accomplish that result.

3. ———: ———: ———. There was substantial evidence in this case that defendant's employees in charge of defendant's car used unnecessary force in expelling plaintiff while he was trespassing thereon, and this court will not interfere with the verdict on the claim that it is against the weight of the evidence.

4. ———: ———: ———: **Punitive Damages: Evidence Showing Mitigation of Offense.** Where a plaintiff is seeking punitive damages for excessive force used in his ejection from defendant's car, it is competent for defendant to prove by its witnesses that plaintiff had made a practice of riding on cars which were not in passenger-carrying service and had had controversies with defendant's employees over his claimed right to enter such cars. This evidence was competent on the question of malice, and its effect would tend to show that plaintiff had persisted in making a nuisance of himself, and it would have tended to mitigate defendant's offense in using excessive

force. The court erred in refusing to admit such evidence, but as the jury allowed no punitive damages its error was harmless.

5. ——: ——: ——. If the above evidence had been admitted it would have impeached plaintiff as to certain statements made by him in his evidence on that issue. But as the jury allowed plaintiff no punitive damages, the failure of the court to admit this impeaching evidence became harmless error.

Appeal from Buchanan Circuit Court.—*Hon. C. A. Mosman,* Judge.

AFFIRMED.

*R. A. Brown* for appellant.

*C. V. Hickman* and *Brewster, Ferrell & Mayer* for respondent.

JOHNSON, J.—Plaintiff alleges, in his petition, that defendant unlawfully and maliciously assaulted him and ejected him from a street car operated by defendant on one of the lines of its street railway system in St. Joseph. Both compensatory and exemplary damages are claimed. The answer is a general denial. A trial to a jury resulted in a verdict awarding plaintiff $1250 as compensatory damages and allowing nothing by way of exemplary damages. Defendant appealed and contends, first, that the verdict is so clearly against the evidence that it should be pronounced the result of passion and prejudice on the part of the jury. The well-settled rule that prevents us from interfering with a verdict on the ground that it is against the weight of the evidence is recognized by counsel for defendant whose contention, in substance, is that the demurrer to plaintiff's evidence should have been sustained on the ground that the evidence clearly discloses, not only a lack of merit in the cause of action asserted, but that plaintiff began and prosecuted the action in

Hermann v. Railway, Light Heat & Power Co.

bad faith and pursuant to a prearranged plot to involve defendant in a lawsuit of this nature.

Facts disclosed by the evidence of plaintiff are as follows: The incident which gave rise to the controversy occurred early in the morning of February 13, 1909. Plaintiff, who was employed in a Turkish bath establishment at Sixth and Edmond streets in St. Joseph and who lived in the north part of the city near defendant's "Union line," left home before daylight to go to work. He boarded a slowly moving, inbound car, in charge of a conductor and two motormen—one the regular motorman and the other a "student." The conductor refused to receive him as a passenger and ordered him to leave the car for the reason that the car was not then in service for the transportation of passengers, but was on its way from the car barns, which were located on the "Union line," to Fifth and Edmond streets, a junction point where the car would begin its service on the "Wyatt Park line." That junction was only a block from plaintiff's place of business and he requested that on account of the severe cold he be allowed to ride to the junction and he offered to pay his fare. The conductor refused the request and told plaintiff to get off. Plaintiff kept his seat and when the car had crossed some railroad tracks, the motorman came back into the car at the request of the conductor to assist in the ejection of plaintiff. Plaintiff testified: "He (the motorman) had a piece of brass; it looked like a wrench or something in his hand . . . the conductor grabbed me and started me to the door. . . . He (the motorman) took hold of the other side and helped him back. . . . I walked to the door . . . Well, I started—I had hold of the handle like this (indicating); was facing the way the car was going and just as I was going to get off, the conductor kicked me and then I fell. Q. What did the conductor kick you with—what part of his body? A. Kicked me with his foot. Q. Where did he strike you? A. Hit me in

the abdomen, right here (indicating). Q. Which side?
A. On the left side."

At this point plaintiff lost consciousness and did
not regain it until two weeks had elapsed. A colored
man introduced as a witness by plaintiff was on the
street and saw plaintiff ejected. He testified "He (the
conductor) come back to the man again and lays his
hands on his shoulder. I don't know what the words
was at all and he then turned around and looked and
the motorman came in and they both held their hands
on his shoulder. . . . As he went to the steps he
grabbed hold of the car and they shoved him out. Q.
How did they shove him out, with their fists or hands?
A. I don't know; so quick—only just come around
and shove him with his knee and feet; he held the car
that way as if he was going to get on. . . . Q.
What became of the man; how far did he go from the
car? A. When he first fell off the car, he went down,
he got up and fell again and hollered for me to come
over and I said, 'No, sir. I ain't going to.' . . . He
just got up and rolled and fell and he wanted me to
come to him and I told him, 'No,' I was not coming to
him."

The witness waited for another car to come and
when it came, he stopped it and called the conductor's
attention to plaintiff who was lying in the street. There
was a policeman on the car and he and the conductor
put plaintiff aboard and took him to Fifth and Edmond
streets and from there to the bath house. The policeman
testified: "The old gentleman—the colored man—first
said that there was a man here on the south side of the
track; at that time we were pulled across the track—
the conductor flagged the car and they pulled across
the track and stopped and I found this man that was
there hurt, and I got off and I helped the conductor
get him on the car. . . . Q. How did he get to
the bath house? A. We helped him there. . . .
Q. What was his condition at the bath house? A.

Hermann v. Railway, Light Heat & Power Co.

Seemed hurt. . . . Q. What were his actions at
the bath house; what did he do; what happened to him?
A. Well, I believe one time he got off the cot and
started like he was going straight across the room and
he fell and hit his head against the table or something
there. . . . Q. What was his manner as to whether
he understood what he was saying or not? A. Well,
it seemed that he understood part of the time what he
was saying and part of the time I don't really think
he did."

A doctor called to the bath house to give plaintiff
professional attention testified that plaintiff "wasn't
unconscious; he was rather delirious; talked foolishly.
. . . Q. Was he able to get up and walk? A. He
would get up and fall back and once when I had my
back turned for a moment, why he got up and fell on
the floor. . . . Q. Did you accompany him home?
A. Yes, sir. . . . Q. Was he ever confined to his
bed? A. About four weeks after the accident. Q.
What injuries, if any, did you find at the time you saw
him, what was his condition? A. Well, at first he
couldn't stand up; that seemed to be due to the pain
that he had in his head; a kind of vertigo; he had posi-
tive symptoms of concussion of the brain; he would
be taken with blindness and he would raise his head
and his eyes would turn up; he couldn't see; I exam-
ined him; there was no wound or anything of that sort
such as would produce a hemorrhage; and when I found
that out, I had the ambulance called and put him in
the ambulance and got him home. And there I went
over him more carefully and found that he had partial
control of his legs; not good control; well, I had him
lie down and after I put him to rest, he would rise up
in a sitting posture and would then fall back.
Q. What did you find in your examination of his body?
A. Well, there was a slight blackening of the skin—
underneath the skin—on the abdomen and a little to
the left of the middle line. . . . Q. On your ex-

amination did you find anything wrong with his back or spine? A. No, there was nothing in the world that could be seen such as a bruise or a cut. The bones were not out of place or broken; still he had that symptom of vertigo; his eyes were badly bloodshot. · Q. ˙ How about his urine? A. I didn't examine his urine at first, but he could pass it very well; it seemed ˙to be more or less spasmodic; I used heavy cloths and passed a catheter and after I did, he lost control of his sphincter. Q. That is what is called incontinence of urine? A. Yes sir. Q. Does that condition still exist? A. Still exists in him."

Plaintiff says that throughout the occurrence he was courteous to the conductor and motorman, that he was afraid to be otherwise and that the conductor was abusive in his language and demeanor. The conductor and motorman tell a different story. They describe plaintiff as being boastful and insulting. They say he claimed he had consulted a lawyer who advised him that he had a right to ride on any car run on the road whether or not it was in service at the time, and he invited the conductor to feel the muscle of his right arm and then think again before attempting to put him off the car. Evidence of defendant tended to show that plaintiff was in the habit of boarding cars he knew were on their way from the barn and not in commission, and ·of forcing the conductors to receive him as a pas-senger by threats and intimidations. Further it appears from defendant's evidence that plaintiff was not assaulted as he left the car and that he did not fall but voluntarily threw himself to the pavement and simulated an injury.

It will be seen that the evidence is very conflicting. From the viewpoint of that introduced by defendant, plaintiff is an impostor and we must say the evidence supporting that view is strong and persuasive. But we feel compelled to say that the evidence of plaintiff is substantial and of sufficient evidentiary strength to

raise issues of fact for the jury to solve. The jury, in believing that evidence, were justified in finding that the servants of defendant in charge of the car had employed unnecessary force in the expulsion of plaintiff and, in so doing, had seriously injured him. There is no dispute, nor is there room for any, over the proposition that plaintiff was wrong in persisting in his efforts to be received as a passenger on that car after he knew it was not in service. Defendant had the right to say which of its cars should carry passengers and which should not, and certainly it had the right to refuse to carry passengers on cars during their passage between the barns and the lines where they were to be put in service. Plaintiff should have left the car on the demand of the conductor and his refusal to comply with the demand justified the conductor in expelling him. But in the performance of this duty to his employer, the conductor was bound to use no more force than was reasonably necessary to accomplish the expulsion. The evidence of plaintiff shows that unnecessary violence was employed. Such violence would give plaintiff a cause of action for the resultant injuries and we see nothing in the record to justify the conclusion that the verdict was the product of passion or prejudice. It was the result of the jury believing plaintiff and his witnesses in preference to the witnesses of defendant. The demurrer to the evidence was properly overruled.

Plaintiff testified that on former occasions he had been accepted as a passenger on cars not in service on the Union line. He knew defendant did not want him to ride but, nevertheless, he persisted in his efforts to ride on such cars. He was cross-examined as follows:

"Q. Did you ever tell any of the boys that ran on those cars there when you got on the cars that you would jump on those cars; that you had consulted a lawyer and that you would ride on any cars you pleased? A. No, sir."

Afterward defendant introduced witnesses to contradict plaintiff by showing that "plaintiff had had trouble and controversies with the trainmen in charge of the short line cars prior to the time he was ejected from defendant's car, and that he had told these men that he had consulted a lawyer and had been advised that he had a right to ride upon any of the cars and that he would ride upon them." Defendant contends that the court committed error in excluding this evidence. At the time of the offer, the issue of whether or not punitive damages should be allowed was in the case and the evidence clearly was pertinent to that issue. The gravamen of the action was the use of unnecessary force in the ejection of a wrongful intruder. The evidence in question had no bearing on the issue of whether such force was used, but it possessed an evidentiary relation to the question of malice and, therefore, was important to the consideration of punitory issues. If plaintiff had made a nuisance of himself by persisting in his efforts to force himself into a place where he did not belong and was not wanted, the jury were entitled to consider that fact as tending to mitigate the offense of defendant in using excessive force and the court erred in excluding the evidence. But the error became harmless when the jury failed to assess any punitive damages. The evidence had no bearing on the issues relating to compensatory damages. Defendant argues that it tended to impeach plaintiff, but with exemplary damages out of the case, it contradicted him only on an immaterial matter and the rule is well settled that "the contradictory statements which may be shown for the purpose of impeaching a witness must be of facts pertinent to the issue and which could have been shown in evidence as facts independently of the inconsistency." [Hamburger v. Rinkel, 164 Mo. l. c. 407; Roe v. Bank, 167 Mo. l. c. 426; Wojtylak v. Coal Co., 188 Mo. l. c. 289.]

The evidence being impertinent to any issue now in the case should not be given any effect, though at the time of its offer it was pertinent to an issue then being contested but afterward resolved by the verdict in favor of the party offering the evidence.

The judgment is affirmed. All concur.